*512 The opinion of the Court was delivered by
O’Neall, C. J.
The elaborate decree of my brother Ward-law (while a Chancellor) is in many of its parts entitled to the commendation of every well-informed mind. Yet there are parts which have not met with the concurrence of this Court. One, a very material part, on which the whole case depends, has not been satisfactory to a majority. Indeed, on it we have come to a conclusion entirely antagonistic to the decree.
In the first place, I turn to the Act of 1820, referred to and considered in Frazier vs. Frazier, 2 Hill Ch., 311. By that Act the evil was stated “the great and rapid increase of free negroes and mulattoes in this State, by migration and emancipation,” the remedy provided was, “that no slave shall hereafter be emancipated but by Act of the legislature.”
It was argued that the statement of the evil was the increase of free negroes and of mulattoes but the true reading of the Act, is, the adjective free qualifies mulattoes, as well as negroes: and read in that way we have the evil as the legislature intended to state it, the great and rapid increase of free negroes and free mulattoes in this State.
What is the effect of the enactment that “no slave shall hereafter be emancipated but by Act of the legislature?” In Frazier vs. Frazier, twenty-five years ago, with the concurrence of my distinguished brother and friend, Judge David Johnson, I stated that this Act could not “ have effect upon emancipation beyond the limits of the State.” It is very true my brother Harper, the other member of the Court, did not sign the opinion, but he gave no dissent, and I happen to know that his objection was more to the competency of slaves to have such a decree pronounced in their favor than to the principles of the decree. He recognized the general principles of the decree in Gordon vs. Blackman, 2 Rich., 45, in which he said: “In Frazier vs. Frazier, the Court decided that it would not interfere to prevent the execution ot the trust when there was no law to forbid it.” The *513 case of Frazier vs. Frazier was also recognized in Finley vs. Hunter, 2 Strob., 214. The case of Frazier vs. Frazier was the law until the Act of 1841; that Act provided that a devise for the removal of a slave from the State for emancipation should be void. That introduced a new rule of action, and it is our duty to enforce it when a proper case arises. If the objects of the testator’s bounty, Amy and her children, had remained in the State until the testator’s death, there can be no doubt that the devise directing them to be taken by his executors to Ohio, and there to be manumitted, would have been contrary to law, and the other devises in their favor must have failed. But Elijah Willis, in his lifetime, removed them to Ohio, with the avowed purpose to emancipate thém. He died when he and they were ou the northern bank of the Ohio, in the City of Cincinnati. If that act made Amy and her children free, then it follows that the devises in their favor are good.
The Constitution of Ohio, in the spirit of the Ordinance for the government of the territory north-west of the Ohio river, provides “there shall be no slavery in this State, nor involuntary servitude unless for the punishment of crime.” It is vain to say that this is contrary to the Constitution of the United States. Each and every State as it emerges from a territorial government, is free to adopt their Constitution, allowing or rejecting slavery.
This provision cannot reach cases of persons passing through Ohio with slaves, or where a slave accompanies his master or mistress on a temporary sojourn for business or pleasure. For, in point of fact, the master, and the slave, as his property, are entitled by the comity of States, and also by the Constitution of the United States, to be protected. Cobb on Negro Slavery, chap. 7, sec. 152, 153.
But the case is very different when the master puts his, slaves on the soil of Ohio with the purpose of making them free. It is then true, that they become free by his act. The eloquent counsel for the defendant, in his own work on *514 negro slavery, (Cobb on Negro Slavery, chap. 7, § 154, 1 paragraph) states the principle which applies to and governs such a case “ where there is a change of domicil from a slave holding to a non-slaveholding nation, the animus remanendi works of itself and instanter (simul ac imperii fines intrarunt) the emancipation of the slave.” It is true Mr. Willis did not change his own domicil, although his last act in life was reaching the soil of Ohio. He intended to return, and therefore his own domicil was not changed, but his act and intention both concurred in placing his slaves, who before were mere chattels personal, in a country where they assumed the character of free persons. This was making Ohio their domicil, and they are there now in the full enjoyment of freedom which caúnot be disturbed. It seems to me, looked at in this plain way, that they are, and were free from the moment when, by the consent of their master, they were placed upon the soil of Ohio to be free. I have no idea that the soil of Ohio per se confers freedom. It is the act of the master which has that effect. In Guillemette vs. Harper, 4 Rich., 190, I stated, in 1850, the principle which governs this case. “If the master carries a slave to Great Britain to set him free, or while there in any way assents to his freedom, there can be no objection to the validity of freedom thus acquired.” I do not understand that the law of that case, which was the unanimous judgment of the Law Court of Appeals, has ever been questioned. In this case, if the facts be as I now assume them to be, that Elijah Willis carried Amy and her children to Ohio to set them free, there can be no doubt that the moment they reached that destination, they became ipso facto free.
To have effect it needed no deed. It is true Mr. Jolliffe, the executor, did, on the 25th of June, 1855, May term of the ■Court for Hamilton County, execute a deed of manumission. But clearly that was unnecessary. It might have been well •enough to place a record of freedom within the constant .reach of the parties. If it were necessary, I should be dis *515 posed to hold that such a deed would have relation back to the moment of arrival. The law of Ohio, 1841, chap. 76, p. 591-6,* was brought to our view ; it requires blacks or mulattoes entering into the State, to give security and to register themselves. This does not affect the question of freedom. It is a mere police regulation for the internal government of such people. This great case turns upon the narrow question: what did Elijah Willis intend and do, in going to Ohio, and carrying, with him Amy and her children ? His purpose was clear; he intended to free the negroes. This required, according to the testimony of experts in Ohio, no other act than merely placing the negroes within the territorial limits of Ohio. But if he intended to do something more, such as buying land for them, schooling the children, &c., I do not see how that can alter the case. For those acts were not at all essential to the act of freedom. They are very important for the comfort of the negroes. When about setting out from home with the negroes, he said to Reason Woolley “ he was going to carry them do Ohio, to Cincinnati; he said'he wanted to go and carry them, and free them, so they could have the benefit of his property. She, Amy, wanted to come back with him; he said to her that when he got her out of South Carolina she should never come back again.” To Mrs. Ary Woolley, a few weeks before leaving with the negroes, he stated his “ object in taking them off was to carry them where they could be free, and provide for them.”
To John H. Howard, in March or April, 1855, he stated, “he had determined to take them to Ohio, and free them there.” To William Cullum on the boat, the Jacob Strader, he said, “he was going to Ohio, to set them (the negroes) free, and school the children.” After this array of testimony, there can be no doubt what was his purpose. Indeed, from what is proved by other witnesses, he had long had the *516 ptirpose in his mind, in some way to accomplish their freedom. He reached the wharf at Cincinnati, disembarked himself and the negroes, and when about taking a hack to the hotel, with them in company, he fell and expired. Upon his person was found a duplicate of his will. I think these facts show that the intent and the act concurred. He intended to confer freedom on the slaves, he had travelled hundreds of miles to consummate that intention, and had reached a point where they could be free. What more was to be done? It seems nothing further was legally required to give freedom in Ohio. Shall we undertake to say otherwise? Can we reach a hand to Ohio and draw back those people to servitude? They are in the enjoyment of freedom, and we cannot and ought not to interfere.
To allow them to be free, and to permit the devise in their favor to operate, is, we are told, contrary to the policy of South Carolina. I know no policy, except that which her laws declare. To that I shall always (as I have done for thirty-two years, my judicial life) yield obedience. But I should feel myself degraded if, like some in Ohio and other abolition States, I trampled on law and constitution, in obedience to popular will. There is no law in South Carolina which, notwithstanding the freedom of Amy and her childreu, declares that the trusts in their favor are void. As soon as they are acknowledged to be free one moment before the death of Elijah Willis, they are capable to become the cestui que trusts under his will.
Indeed, in one case (Bowers vs. Newman, 2 McMul., 659,) of which we have a very imperfect report, Harper, J., and myself held that a slave could take freedom and property by the same devise.
It is supposed it is necessary to ascertain “ what was Elijah Willis’ intention after he reached Ohio, not before.” We can only judge of that by what had occurred before. We know what he intended tip to the moment when he reached Cincinnati. What did he intend when the boat reached the wharf? *517 He might possibly then have remained on the boat with his slaves and have returned to South Carolina. But he did not do that, he made the act of freedom absolute by landing within the territorial limits of Ohio. This showed he intended td confer freedom by making Ohio their home. He had told Amy, “ when he got. her out of South Carolina she should never return.” The act made his words good. For he could not, if he had desired it, have again reduced her to slavery.
I have not undertaken to review many of the cases cited in the elaborate decree of the Chancellor, as in the able argument of the case here. For the case turned upon a very narrow point; in which the lights of authority could only help to the general principle, that if the act done was in consequence of the intention previously expressed, it was enough for the case.
This has been proved to be so on a review of the whole law and facts, and the result is, that the woman Amy, and her children, were free at the death of Elijah Willis, and were capable to become the cestui que trusts of the executor.
The Chancellor’s decree is reversed, and the bill dismissed.
Johnstone, J. — I concur in the result.

 These laws have been entirely repealed by the Act of 1819, which has been placed in my hands since the delivery of this opinion. See Acts of a general nature, 47th General Assembly of Ohio, vol. 17, page 18, sec. 6.